Filed 1/28/14  In re N.P. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re N.P. et al., Persons Coming Under the Juvenile Court Law.

_____

RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,

     Plaintiff and Respondent,

v.

J.P.,

     Defendant and Appellant.

E059359

(Super.Ct.No. SWJ1100116)

**OPINION**

APPEAL from the Superior Court of Riverside County.  Donna L. Crandall, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art VI, § 6 of the Cal. Const.)  Affirmed.

Lisa A. Raneri, under appointment by the Court of Appeal, for Defendant and Appellant.

1

Leslie A. Barry, under appointment by the Court of Appeal, for Respondent Minors.

Pamela J. Walls, County Counsel, and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

J.P. (Mother) appeals after the termination of her parental rights to N.P. and L.P. at a Welfare and Institutions Code section 366.26[1] hearing and the ordered permanent plan of adoption.

Mother makes the following claims on appeal: (1) the juvenile court lacked substantial evidence of the wishes of L.P. and N.P. as to whether they understood that adoption would preclude contact with Mother or that legal guardianship was an alternative plan to adoption as required by section 366.26, subdivision (h); (2) the beneficial parent exception to terminating Mother's parental rights (§ 366.26, subd. (c)(1)(B)(i)) applied to preclude termination of her parental rights; (3) the sibling exception to terminating Mother's parental rights (§ 366.26, subd. (c)(1)(B)(v)) applied; and (4) the juvenile court erred by finding N.P. was adoptable.[2]

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] N.P. and L.P. were appointed counsel on appeal. Minors' counsel has filed a brief agreeing with the respondent that the juvenile court orders should be upheld.

We affirm the juvenile court's order terminating Mother's parental rights and finding N.P. and L.P. adoptable.

I

PROCEDURAL AND FACTUAL BACKGROUND

A.   *Detention*

L.P. (who was 5 years old) and N.P. (who was 11 years old) were put into protective custody on February 14, 2011, along with their older half sister, La.P (who was 12 years old)[3] by the Riverside County Department of Public Social Services (the Department).  There were a series of incidents which led to the children being detained.

On January 22, 2011, a social worker responded to the home occupied by the family.  It was reported that Mother had beat La.P a week before.  Mother held La.P on the couch and punched and choked her.  Mother claimed that La.P had Multiple Personality Disorder and Dissociative Disorder.  On the day of the incident, La.P had become enraged and violent and Mother was trying to restrain her.  If she hit La.P, it was only in self defense.  La.P had a "busted lip" from the incident but La.P claimed she bit her own lip during the struggle.  She confirmed her Mother's story.

Another referral was received on January 27, 2011.  Mother had been seen choking and hitting La.P.  The children's stepfather, who also lived in the house, had been seen throwing La.P against a wall.  N.P. had been encouraged by Mother to hit La.P

---

[3]   La.P is not a subject of the instant appeal but since Mother has raised the sibling exception, her behavior and placement are relevant to the issues raised on appeal.

with a broom. Stepfather and Mother were suspected of using methamphetamine. Stepfather had been reported to shoot pellets from an air gun at the children.

On January 28, 2011, it was reported that Mother had previously attempted to commit suicide by taking 50 antidepressants and other pills. La.P had not been regularly attending school.

A social worker went to the house on January 31, 2011. Mother and stepfather denied abusing the children. Mother was attempting to get psychological counseling for La.P. Stepfather used marijuana to help with pain but did not have a medical marijuana card. He considered shooting pellets at the children to be fun but agreed he would stop. Mother admitted that she had previously attempted to commit suicide.

La.P was interviewed at school on February 1, 2011. She denied she was hit or beaten by Mother or stepfather. La.P accepted responsibility for the altercations with Mother. La.P reported that A.H., who was her father, sexually abused her when she was "little." N.P. and L.P. were interviewed the same day. N.P. denied knowing about any drug or alcohol abuse in the home. He also denied that Mother and stepfather hit him. L.P. said it was fun at home and that there were no problems at home.

A report was received on February 14, 2011, that Mother had beaten the stepfather with a chair and punched him in the face. It was reported that Mother had attempted to commit suicide by taking an entire bottle of prescription medication. She was currently hospitalized. Mother was combative and in an altered state when she was admitted. She was in critical condition and placed on a ventilator. She was being moved to an intensive care unit. The children were present during the altercation and the suicide attempt.

4

Stepfather reported that in the evening on February 13, he was sitting in the living room on the couch. Mother emerged from the bedroom and started yelling at him. She began beating him. N.P. was sitting on a nearby chair. She pulled the chair from underneath N.P., causing him to fall on the floor. N.P. hit his knee and had a small bruise on his knee. Mother hit stepfather in the chest with the chair. She dropped the chair and hit him with her fists. She ordered stepfather to pack his things and leave. He refused because the children needed him.

Mother went back to the bedroom. She sat on the bed and started swallowing her prescription medications. Stepfather asked her what she was doing, and she said, "I am just trying to be happy." Stepfather dialed 911. Both Mother and stepfather tested positive for marijuana.

N.P. and La.P were present when Mother was hitting stepfather and both children were crying. The children were all taken into protective custody. After being taken into custody, La.P stated she had been watching television with N.P. in the living room. La.P said that Mother came out yelling at stepfather. Mother started hitting stepfather with the chair. Mother hit stepfather with her fists. La.P and N.P. were crying. N.P. essentially confirmed the story of stepfather and La.P. He was hurt on his knee but the wound was healing. L.P. had heard yelling and saw Mother being taken away in an ambulance.

Mother was able to speak with the social worker on February 15. She stated she had a miscarriage on February 2 that caused her to be depressed. She was taking antidepressants. She awoke on Feburary 13 and stepfather was smoking marijuana in the bedroom. She was mad and told him she did not want the children to be taken away

5

because of his "stupidity." She did not recall anything regarding her beating the stepfather. She did not recall taking all of her medication. Mother denied smoking marijuana despite her drug test showing otherwise.

Mother claimed that R.P., who was the father of N.P. and L.P., was abusive toward the children. While Mother was married to R.P., he was abusive to her. Between 2007 and 2009, La.P had been admitted to a children's psychiatric hospital. La.P claimed during her hospitalization that she had been molested by A.H. when she was nine years old. Mother believed that A.H. was incarcerated. Mother was being evaluated by mental health professionals before being released from the hospital.

R.P. contacted the Department once he found out the children had been removed from Mother. He had an interest in all of the children living with him. He denied any abuse of Mother or the children.

On February 16, 2011, a section 300 petition was filed by the Department against A.H., R.P. and Mother. It alleged against Mother, under section 300, subdivision (b), that she had unresolved mental health issues, she had attempted suicide in the presence of the children, she engaged in domestic violence with the children's stepfather, and she abused controlled substances in the home, including marijuana. As for A.H, it alleged he had a prior criminal history and was incarcerated, and had failed to protect La.P despite obvious awareness of her mental health issues. It was alleged against R.P. that he had failed to protect N.P. and L.P. when he must have been aware of Mother's mental health problems. The petition also alleged against A.H. and Mother a failure to provide support for the children.

6

At a detention hearing held on February 17, 2011, the juvenile court found a prima facie case and ordered La.P, N.P. and L.P. detained. R.P. was named the presumed father of N.P. and L.P., and A.H. was named the alleged father of La.P.

B. *Jurisdictional/Dispositional Report and Hearing*

In a jurisdictional/dispositional report filed on March 9, 2011, the Department recommended that Mother, A.H. and R.P. be granted reunification services. It was also recommended that the children remain detained together. Mother was to submit to a psychological evaluation.

R.P. reported that he was granted joint legal custody of N.P., L.P. and La.P in New Mexico. Mother took the children to California without his permission. There were unsubstantiated reports to New Mexico social services while the children lived with him and Mother between 2000 through 2009. These included reports of filthy conditions in the home, poor supervision, La.P having trouble at school, physical abuse by R.P. against N.P. and La.P, and physical abuse by Mother against La.P. R.P. denied abusing the children.

On March 20, 2010, New Mexico Social Services received a referral that Mother had attempted suicide while the children were present. R.P. took custody of the children. A.H. had numerous prior convictions. A.H. was interviewed and claimed he had been off parole for three years. He had been looking for La.P for five years but could not find her. A.H. wanted custody of La.P.

N.P. stated that R.P. beat him and his siblings, and locked them in the house. N.P. liked being in foster care because the people were nice to him. N.P. claimed the house in

7

New Mexico was haunted; ghosts followed him around the house and La.P talked to them. L.P. liked her foster home.

Mother admitted she had attempted suicide and it was not a "smart" decision. She denied that she used drugs. She believed her mental health issues were more intense than just depression. Stepfather claimed that he was the one who took care of the children. Mother just stayed in her bedroom. Stepfather insisted that Mother had a serious mental illness. Stepfather's ribs were broken when Mother hit him with the chair. He and Mother were getting a divorce and he would not be considered for placement.

The jurisdictional/dispositional hearing was conducted on March 14, 2011. The petition was amended to strike the section 300, subdivision (g) allegations and an allegation against A.H. The juvenile court found the allegations in the amended petition true after R.P., A.H. and Mother waived their rights to a hearing. R.P., A.H. (who was declared the biological father of La.P) and Mother were granted reunification services.

C.    *Six-Month Status Review Report*

A six-month status review report was filed on September 1, 2011. It was recommended that La.P be placed with A.H. under Family Maintenance. At the time of the report, La.P was in a different foster home than N.P. and L.P.

Mother was living with a friend. Mother reported that she was pregnant with another baby. The father of the baby was "Mr. Lopez." Mother was participating in services but was not benefiting from them. Mother reported that La.P lied and had mental problems. Mother had failed to participate in a psychological evaluation or

8

individual therapy. Mother could not take medication for her mental illness since she was pregnant.

A.H., who was married, wanted placement of La.P in their home. La.P wanted to be placed with A.H. and did not want to be with Mother. La.P got into an argument with her foster brother in her new foster home and La.P threw a remote control at the boy's face. La.P felt bad and went into her room. She cut her arm with a bottle-cap opener. She cut her wrist with a ball point pen. She was taken to the hospital. She was prescribed medication by the mental health hospital.

N.P. was enrolled in honor classes at school. The social worker recommended therapy for N.P. L.P. was doing well in school.

N.P. was mature for his age. He had adjusted well to his placement. He was not sure he wanted to be with either R.P. or Mother. L.P. had reported that R.P. had asked her to touch him in the groin area. N.P. and L.P. were going to be moved because the foster mother was sick.

Mother had visited regularly with N.P. and L.P. She oftentimes brought the children very expensive gifts. However, Mother was not attentive during visits, oftentimes talking on her telephone or talking to the social worker.

At the six-month review hearing held on September 13, 2011, La.P was placed with A.H. on a Family Maintenance plan. Her case was transferred to San Bernardino County. Mother's reunification services were continued for N.P. and L.P.

On November 7, 2011, it was reported by Mother's roommate that she had left town and stolen items from her. Mother missed a visit on November 3, 2011, and never

9

contacted the social worker.  Mother had been sporadic in her visits with L.P. and N.P. She brought inappropriate music and movies for the children.  A.H. had reported that La.P had been caught having sex at school with another student and had given her psychotropic medication to other students.

D.    *12-Month Review Report and Hearing*

The 12-month review report filed on February 28, 2012, recommended that Mother's and R.P.'s reunification services be terminated.  It also recommended that a section 366.26 hearing be set and that the permanent plan be adoption.

Mother delivered her new son, K.B.,[4] on January 14, 2012.  He was also detained by the Department.

On February 3, 2012, Mother was arrested for inducing a minor to sell drugs and child endangerment.[5]  She pleaded guilty and was scheduled to be sentenced on March 14, 2012.  She was currently incarcerated.

N.P. was developing normally.  He was doing well in most of his classes at school. He showed no signs of mental illness but he did receive counseling to differentiate between fantasy and reality.  L.P. was developing normally and doing well in school. Both were adjusted to their foster care.

---

[4]    K.B. is not a subject of the instant appeal.
[5]    The record contains no details as to the circumstances surrounding this arrest.

10

Mother had not attended individual counseling. A psychiatric evaluation was completed on November 16, 2011, by the Riverside County Department of Mental Health and she was found not to need therapy or medication. Mother had regularly attended visitation since November 14, 2011, until her incarceration. Both N.P. and L.P. were thriving in the foster home.

An addendum report was filed on March 29, 2012. Mother had been sentenced to a three-year prison sentence.

On April 4, 2012, Mother waived her rights to a hearing and submitted on the reports. Mother was incarcerated and expected to serve at least one year in custody. The juvenile court terminated reunification services for Mother and ordered monthly visitation. N.P. and L.P. were present at the hearing and were interested in possibly being placed with R.P. His reunification services were continued.

An addendum report was filed on September 21, 2012. It was recommended that reunification services be terminated as to R.P. Mother was still incarcerated. N.P. was reported as developing normally and was doing well in school. He had been diagnosed with ADHD but was not taking medication. He still displayed behaviors of living in a fantasy world. L.P. was also developing normally and was doing well in school.

During the reporting period, R.P. had not contacted the Department and had not spoken with the children. No visitation between Mother and the children occurred due to her incarceration and the decision by the Department that it would be harmful for the children to visit her in prison. N.P. had told a social worker he would like to visit Mother

11

in prison.  N.P. had cried for "hours" when he received a letter from Mother.  He had to read the letters with his therapist.

The contested review hearing was conducted on November 6, 2012.  R.P. was not present and the parties submitted on the reports filed.  R.P.'s reunification services were terminated.  The matter was set for a section 366.26 hearing.  Adoption was the permanent plan.  The juvenile court noted that placement of L.P. and N.P. with La.P was not a consideration because she was on a different track since she had been placed with her father.

On December 7, 2012, the Department filed an ex parte application requesting an order for a psychological evaluation of N.P.  N.P. was being aggressive with other children and having difficulties with socialization.  There was a chance he suffered from Asperger's Syndrome.  Finding an adoptive home for N.P. and L.P. was difficult due to his behavior.

E.      *Section 366.26 Report*

The section 366.26 report was filed on January 17, 2013.  N.P. was now 13 years old and L.P. was 7 years old.  Additional time was needed to find an adoptive home for N.P. and L.P.  N.P. had an active imagination and liked to tell stories.  He was very sensitive.  He was upset by information from his Mother that he knew was false.  He was doing well in school.  A psychological evaluation was pending for N.P.  N.P. was an avid reader and loved science fiction.

N.P. and L.P. had expressed that they wanted to live in their former foster home and be adopted by the former foster mother.  The former foster mother had been

12

contacted, she expressed interest in adopting them, and they were returned to her care. N.P. and L.P. were happy to be back with the foster mother.

N.P. and L.P. had one visit with Mother while she was in prison, which took place through a glass window and over the telephone. Mother told the children she would be out of custody and they would be returning to her care. She blamed her incarceration on La.P, who she claimed told lies about her. N.P. and L.P. started crying. Mother knew she had two years to complete on her sentence. The Department recommended that no further visitation be authorized.

N.P. and L.P. were happy about being with the foster mother but were confused by Mother's promises. One of the service providers disagreed that N.P. needed a psychological evaluation and refused to approve the evaluation.

On February 4, 2013, the matter was continued in order to find a suitable adoptive home. At the hearing, the juvenile court noted, "I'm not sure, no matter what happens, whether [N.P.] is going to agree to be adopted at any point, which is his right. He must consent. I'm not so sure whatever we do or the Department does, whether he's going to want to agree to that." Minor's counsel had no comment on N.P.'s wishes.

The Department filed an addendum report on the day of the hearing requesting a restraining order against Mother to protect the children and the foster mother. They also requested that visitation be terminated. An anonymous phone call was received by the Department that reported that Mother had paperwork in prison reflecting the address of the foster mother. Upon her release, Mother planned to pick up the children and take

13

them to Las Vegas. The Department's request for a restraining order against Mother was denied.

The juvenile court admonished Mother not to promise anything to N.P. and L.P. and visitation was continued. The juvenile court suggested that the Department consider legal guardianship if N.P. would not agree to the adoption.

An addendum report was filed on May 9, 2013. The recommendation was to terminate Mother's parental rights and free N.P. and L.P. for adoption. The prospective adoptive mother, the former foster mother, had custody of N.P. and L.P. since December 2012. She loved the children and wanted to adopt them. A preliminary adoption assessment had been completed.

N.P. was still receiving counseling. The report stated, "[N.P.] states that he likes living with the prospective adoptive mother and states that this means he gets to change his name. He is happy that the prospective adoptive mother wants to adopt him." L.P. was very excited to be adopted by the foster mother. She was very bonded to the foster family. The prospective adoptive mother had two children close to the children's ages and they were like siblings to N.P. and L.P. The prospective adoptive mother worked and had the means to support N.P. and L.P. She had a very supportive family who would help her.

The prospective adoptive mother was amenable to exchanging photographs and letters with the birth family. She was not willing to maintain face-to-face contact. Both N.P. and L.P. called her "mom." They both wanted to be adopted.

14

F.    *Section 366.26 Hearing*

The section 366.26 hearing was held on July 8, 2013.  None of the parties involved were present.  The Department submitted on the reports.  Minors' counsel did not object to the reports and agreed with the recommendations.  Mother's counsel requested that Mother's parental rights not be terminated and that the parental bond exception be applied.  The juvenile court found "clear and convincing evidence" that the children would be adopted.  The parental rights of Mother and R.P. were terminated and L.P. and N.P. were freed for adoption.

II

AGREEMENT TO ADOPTION BY MINORS

Mother claims that section 366.26, subdivision (h) required that the juvenile court consider the wishes of N.P. and L.P. prior to freeing them for adoption and terminating Mother's parental rights.  Further, section 366.26, subdivision (c)(1)(B)(ii) provided an exception to termination of her parental rights if N.P. objected to the adoption.

Section 366.26, subdivision (h)(1) provides as follows:  "At all proceedings under this section, the court shall consider the wishes of the child and shall act in the best interests of the child."  Section 366.26, subdivision (c)(1)(B)(ii) provides an exception to the termination of parental rights when a child 12 years of age or older objects to the termination of parental rights.

Mother claims that the juvenile court needed to inquire further of L.P. and N.P. about the consequences of adoption.  Mother insists that the record is silent as to whether N.P. and L.P. were aware of the difference between legal guardianship and adoption, and

15

that they were aware that adoption would preclude further contact with Mother.  Mother has forfeited this issue by failing to raise it in the juvenile court.  (See *In re Amanda D.* (1997) 55 Cal.App.4th 813, 819-820 ["'[Father] raised no issue below that the juvenile court should have obtained the minors' testimony regarding their wishes for a permanent plan.  [Citation.]  He is precluded from presenting it here"].)  Moreover, the party claiming an exception to adoption has the burden of raising the issue below and by failing to do so "waived the right to raise the issue on appeal."  (*In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295.)  Mother failed to claim in the juvenile court that the section 366.26, subdivision (c)(1)(B)(ii) exception applied, and thus has forfeited the claim on appeal.

Even considering the issue on the merits, Mother cannot prevail.  "[I]n considering the child's expression of preferences, it is not required that the child specifically understand the proceeding is in the nature of a termination of parental rights."  (*In re Leo M.* (1993) 19 Cal.App.4th 1583, 1593 (*Leo*).)  "To ask . . . children to choose whether they ever see their natural parent again or to give voice to approving that termination" can traumatize youngsters and is not statutorily compelled.  (*Ibid.*)  Instead, "[w]hat the court must strive to do is 'to explore the minor's feelings regarding his/her biological parents, foster parents, and prospective adoptive parents, if any, as well as his/her current living arrangements. . . .'"  (*In re Amanda D., supra,* 55 Cal.App.4th at p. 820.)  The "evidence need not be in the form of direct testimony in court or chambers; it can be found in court reports prepared for the hearing.  [Citation.]"  (*Ibid.*)  If the record contains no direct evidence of the child's thoughts on the matter, but includes evidence from

16

which the child's feelings can be inferred, the court may draw such inferences. (*Leo*, at pp. 1593-1594.)

While a court must consider the child's wishes, it must also act in the child's best interest. (§ 366.26, subd. (h)(1).) A "child's wishes are not necessarily determinative of the child's best interest [citation]." (*In re C.B.* (2010) 190 Cal.App.4th 102, 125.) An appellate court may presume the juvenile court performed its statutory obligation, if that presumption is supported by sufficient evidence in the record. (*Leo, supra,* 19 Cal.App.4th at p. 1594.)

Here, N.P. and L.P. were not present at the section 366.26 hearing and did not provide direct testimony as to their preference for placement. However, there was ample evidence in the reports reviewed by the juvenile court that L.P. and N.P. wished to be adopted. N.P. and L.P. had asked to be placed back with the prospective adoptive mother. Once in her care, N.P. expressed on several occasions he wanted to be adopted and was excited to change his name. L.P. was very excited about being adopted by the prospective adoptive mother.

Even if the children were advised that legal guardianship would allow them to maintain contact with Mother, and they expressed their preference for legal guardianship, this would not have been in their best interests. (*In re C.B., supra,* 190 Cal.App.4th at p. 125.) Mother attempted suicide on two prior occasions and had injured N.P. during the altercation with stepfather. Mother made no progress in her plan and was sporadic in her visitation. During the dependency proceeding, she was convicted of child endangerment and inducing a minor to sell drugs. She was sentenced to three years in prison. Mother

17

upset the children during visitation, lying to them about her circumstances.  Based on the foregoing, even if the juvenile court erred by failing to fulfill its duty under section 366.26, subdivision (h) by inquiring further of N.P. and L.P., any error was harmless.

Further, the exception pursuant to section 366.26, subdivision (c)(1)(B)(ii) was not applicable.  The record supports that N.P. wanted to be adopted by the foster mother.  The reports filed by the Department set forth that N.P. wanted to change his name and was happy that he was being adopted.  This report was filed after the juvenile court had stated at a hearing that it was not sure that N.P. would agree to the adoption.  The reports establish that N.P. did not object to the adoption, and Mother's speculation that he was not properly informed as to the consequences of the adoption simply is not supported by the record.

The juvenile court properly determined that it was in the children's best interests to be freed for adoption.

### III

### BENEFICIAL PARENT AND SIBLING EXCEPTIONS

Mother argues that the beneficial parent exception of section 366.26, subdivision (c)(1)(B)(i) and the sibling exception under section 366.26, subdivision (c)(1)(B)(v) applied to preclude the termination of her parental rights.

At the section 366.26 hearing, Mother's counsel stated that Mother wished to take care of her children upon release from custody.  Mother's counsel stated, "So I would just simply at this time object to any termination of parental rights and ask the Court to consider any exceptions including the parent/child relationship exception, your Honor."

18

Mother's counsel provided no further argument and the juvenile court found the exception was not applicable

A.    *Standard of Review*

At the section 366.26 hearing, the sole issue "'is whether there is clear and convincing evidence that the child is adoptable.' [Citations.]" (*In re Josue G.* (2003) 106 Cal.App.4th 725, 733; see § 366.26, subd. (c).)  "Adoption, where possible, is the permanent plan preferred by the Legislature.  [Citation.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.)  If the court finds that a child may not be returned to his or her parents and is likely to be adopted, it must select adoption as the permanent plan, unless it finds that termination of parental rights would be detrimental to the child under one of the seven exceptions set forth in section 366.26, subdivision (c)(1)(A) and (c)(1)(B)(i) through (v).  (See *In re Jamie R.* (2001) 90 Cal.App.4th 766, 773.)

Appellate courts have differed on the correct standard of review for determining the applicability of a statutory exception to termination of parental rights.  (Compare, e.g., *In re Autumn H., supra,* 27 Cal.App.4th at p. 576 [applying substantial evidence standard]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [applying abuse of discretion standard]; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [applying substantial evidence standard of review to whether beneficial parent-child relationship exists and applying abuse of discretion to standard to whether that relationship provides a compelling reason to apply exception]; accord, *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)  The "practical differences" among these various standards of review "are

19

not significant" (*In re Jasmine D.,* at p. 1351), and, on this record, our conclusion would be the same under any one of them.

B.     *Beneficial Parent Exception*

The parental benefit or "beneficial relationship" exception is set forth in section 366.26, subdivision (c)(1)(B)(i).  The exception applies where "'[t]he parents . . . have maintained regular visitation and contact with the minor and the minor would benefit from continuing the relationship.'  [Citation.]" (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826.)

"The parent must do more than demonstrate 'frequent and loving contact[,]' [citation] an emotional bond with the child, or that parent and child find their visits pleasant.  [Citation.]  Instead, the parent must show that he or she occupies a 'parental role' in the child's life." (*In re Derek W., supra,* 73 Cal.App.4th at p. 827.)  "The 'benefit' prong of the exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citations.]" (*In re K.P., supra,* 203 Cal.App.4th at p. 621.)  "'The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions.  [Citation.]' [Citations.]" (*In re C.B., supra,* 190 Cal.App.4th at p. 122.)

Initially, Mother's visitation with N.P. and L.P. was not consistent.  During the early period of the dependency, Mother visited with N.P. and L.P., but was reported to not be attentive, spending much of her time on the telephone or talking to the social

20

worker. It was later reported that Mother was sporadic in her visitation. When she did attend visits, she brought inappropriate gifts, music and movies. Finally, Mother was incarcerated on February 3, 2012, and had only one visit with the children after her incarceration.

Mother blames the lack of visitation on the Department not wanting to have the children visit her in prison. However, prior to her incarceration, Mother had missed visitation. Moreover, Mother could blame only herself for becoming incarcerated. Additionally, when the children visited with her, she told them lies and made them upset. Throughout the dependency proceedings, Mother did not maintain consistent visitation, and therefore, fails to meet her burden of establishing the first prong of the parental bond exception.

Moreover, even if we were to consider that Mother maintained visitation, she cannot show that their relationship "'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citations.]" (*In re K.P., supra,* 203 Cal.App.4th at p. 621.)

Here, although Mother had been present for a large portion of the lives of N.P. and L.P., this did not mean the relationship was beneficial. "The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. omitted.)

21

Mother had a history of mental illness and she had attempted suicide on two occasions. During her altercation with stepfather, she showed no concern for N.P., pushing him from his chair and hurting his knee. Mother was arrested during the dependency proceeding for inducing a minor to sell drugs and child endangerment. Mother's visits with N.P. and L.P. and her letters to N.P. caused the children to be upset. Although there was some bond between Mother and N.P. and L.P., she simply did not occupy a role of a parent. Mother failed to meet her burden of establishing that the parental bond exception was applicable as to preclude termination of her parental rights.

C.      *Sibling Exception*

Section 366.26, subdivision (c)(1)(B)(v) provides an exception to the termination of parental rights if the court finds a compelling reason for determining that termination would be detrimental to the child due to a "substantial interference with a child's sibling relationship, . . . "

The juvenile court undertakes a two-step analysis in evaluating the applicability of the sibling relationship exception. First, the court is directed "to determine whether terminating parental rights would substantially interfere with the sibling relationship by evaluating the nature and extent of the relationship, including whether the child and sibling were raised in the same house, shared significant common experiences or have existing close and strong bonds. [Citation.] If the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit

22

the child would receive by the permanency of adoption." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951-952.)

"[T]he concern is the best interests of the child being considered for adoption, not the interests of that child's siblings." (*In re Naomi P.* (2005) 132 Cal.App.4th 808, 822.) "Indeed, even if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption. [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 61.)

Initially, Mother has waived her claim by failing to raise the exception in the juvenile court. The party claiming an exception to adoption has the burden of raising the issue below and by failing to do so "waived the right to raise the issue on appeal." (*In re Rachel M., supra,* 113 Cal.App.4th at p. 1295.)

Even if we were to consider the claim, it is clear that N.P. and L.P. were bonded to La.P. However, La.P had severe mental issues and presented a danger to herself and possibly N.P. and L.P. La.P had spent several years in a psychiatric facility in New Mexico because she was cutting herself and hearing voices. She was hospitalized during the dependency proceedings because she cut her own arm. She had also been violent with a foster child at her placement. La.P presented a real danger to N.P. and L.P.

Further, La.P was placed with her own father, A.H., and he did not want to take custody of all of the children. Even after La.P was placed with A.H., it was reported that she got caught having sex at school and giving other students her psychotropic medication. La.P's future was uncertain. Continuing the sibling relationship did not

23

outweigh the benefit N.P. and L.P. would receive by gaining a permanent home through adoption. (*In re Celine R., supra,* 31 Cal.4th at p. 61.) The sibling bond exception did not apply.

IV

ADOPTABLITY OF N.P.

Mother's final claim is that the juvenile court erred by finding that N.P. would be adopted within a reasonable time.

We have previously stated that adoption is the permanent plan preferred by the Legislature. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 573.) "The juvenile court may terminate parental rights only if it determines by clear and convincing evidence that it is likely the child will be adopted within a reasonable time. [Citations.] "'''"Clear and convincing" evidence requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind. [Citations]'" [Citations.]' [Citation.] Review of a determination of adoptability is limited to whether those findings are supported by substantial evidence. [Citation.]" (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1060-1061; see also In re Asia L. (2003) 107 Cal.App.4th 498, 509-510.)

General adoptability "focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) "[I]t is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' [Citations.]" (*Ibid.*)

24

"[I]n some cases a minor who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child." (*In re Sarah M., supra*, 22 Cal.App.4th at p. 1650.) Thus, a child may be "deemed adoptable based solely on the fact that a particular family is willing to adopt him or her . . . ." (*In re Carl R., supra,* 128 Cal.App.4th at p. 1061.)

Here, N.P. had been with the prospective adoptive mother for a period of nine months in 2011, and was returned to her care in December 2012. By the time of the section 366.26 hearing, N.P. had been in the adoptive mother's care for over six months. The adoptive mother was excited about adopting N.P. and loved him. The fact that N.P. was sought to be adopted by the adoptive mother supports that he was adoptable. (*In re Carl R.,* supra, 128 Cal.App.4th at p. 1061.)

We disagree with Mother that N.P. suffered from a mental illness that precluded him from being found generally adoptable. N.P. did have an imagination, but was also reported as being an avid reader and that he liked science fiction books. N.P. was enrolled in honor classes at school and was doing well in school. One report requested a psychological evaluation for N.P. because he was having trouble with socialization and was aggressive with other children. However, another report stated that an evaluation for N.P. was denied and not needed. The record does not support a finding that N.P. was so emotionally unstable as to be found unadoptable. We find the juvenile court properly determined that both N.P. and L.P. were adoptable.

25

## V

## DISPOSITION

The juvenile court's judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
Acting P. J.

We concur:

KING
J.

MILLER
J.